## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| | Bankr. No. 08-11551 (BLS) |
| PMTS LIQUIDATING CORP., *et al.*, | |
| | |
| Debtors. | (Jointly Administered) |
| | |
| NHB ASSIGNMENTS LLC, | |
| LIQUIDATINGTRUSTEE, ON BEHALF | |
| OF THE LIQUIDATING TRUST | |
| | |
| Plaintiff, | |
| | Civil Action 12-1020-SLR |
| v. | |
| | JURY TRIAL DEMANDED |
| GENERAL ATLANTIC LLC and | |
| BRADEN KELLY, | |
| | |
| Defendants. | |

## THIRD AMENDED COMPLAINT

Plaintiff NHB Assignments LLC, Liquidating Trustee, on behalf of the Liquidating Trust

of PTMS Liquidating Corp. ("Liquidating Trust") brings this action against General Atlantic

LLC and Braden Kelly (the "Defendants") for breaches of their respective fiduciary duties to

PTMS Liquidating Corp. f/k/a ProxyMed Transaction Services, Inc., PM Liquidating Corp. f/k/a

ProxyMed, Inc. and PMLS Liquidating LLC f/k/a ProxyMed Lab Services LLC ("ProxyMed"or

the "Company") and for defrauding ProxyMed.  Plaintiff alleges the following based upon the

investigation of Plaintiff's counsel, which included a review of hundreds of thousands of

documents provided by the Defendants.

## NATURE OF THE ACTION

1.      This case lifts the veil on the surreptitious actions of a private equity investment firm, Defendant General Atlantic LLC ("General Atlantic"), in its pursuit of the largest investment in its history to the detriment of ProxyMed. General Atlantic was the Company's largest shareholder and an active participant in its affairs.  General Atlantic acquired its stake in ProxyMed for $25 million in 2002 and made numerous promises to ProxyMed to provide or facilitate financing to enable the Company to grow and prosper.  However, General Atlantic later set its sights on pursuing a much larger $1.2 billion investment for a majority stake in ProxyMed's most significant competitor, Emdeon, Inc. ("Emdeon") in which it stood to make at least a $400 million in only a few years. While General Atlantic pursued a majority investment in Emdeon's competing business, ProxyMed was seeking $10 million to finance an acquisition that was key to the Company's survival and that would have made ProxyMed a more formidable competitor to Emdeon.  Defendants not only concealed General Atlantic's conflict from ProxyMed, but led ProxyMed to believe General Atlantic would participate in financing ProxyMed's acquisition and failed to advise ProxyMed that their prior representations of financial support could no longer be relied on.  Moreover, Defendants in furtherance of General Atlantic's efforts to consummate an investment in Emdeon,  made new misrepresentations regarding General Atlantic's financial and other support for ProxyMed, on which ProxyMed detrimentally relied.

2.      When General Atlantic's investment in Emdeon, which amounted to $1.2 billion for a 52 percent interest in Emdeon's Business Services segment, was publicly announced, General Atlantic quickly advised ProxyMed that it would provide no financing whatsoever, a decision it had made when it began to pursue its investment in Emdeon. Given

the announcement of General Atlantic's massive investment in ProxyMed's most significant competitor and abandonment of its investment in ProxyMed, the Company was unable to secure alternative financing to close on its key acquisition.  Had ProxyMed been timely advised that it could not count on General Atlantic to play any role in financing its acquisition strategy, ProxyMed would have been able to secure alternative financing prior to General Atlantic's public announcement of its massive investment in Emdeon.  Without the revenues and cost savings the acquisition would have provided, ProxyMed was forced to sell off certain of its businesses at fire sale prices and ultimately file a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on July 23, 2008 in the United States Bankruptcy Court for the District of Delaware ("BR Court"), Bankr. No. 08-11551 (BLS).

3.     General Atlantic owed fiduciary duties to ProxyMed because it assumed a special relationship of trust and confidence with the Company beyond the nature of the agreement between them due to the services and advice General Atlantic provided to ProxyMed as one of its portfolio companies.  General Atlantic also owed fiduciary duties to ProxyMed as a controlling shareholder in ProxyMed.  By its actions as described herein, General Atlantic breached those fiduciary duties for its own profit.

4.     Defendant Braden Kelly ("Kelly"), a Managing Director of General Atlantic, served as General Atlantic's agent and designee on the Board of Directors of ProxyMed.  Kelly served as Chairman of the Board of ProxyMed while General Atlantic pursued its investment in Emdeon and, at the same time, aided General Atlantic in its efforts to acquire a controlling stake in Emdeon.  During all relevant times, Kelly was privy to all of ProxyMed's confidential business plans and actively controlled, on behalf of General Atlantic, all major decisions by

- 3 -

ProxyMed. As a ProxyMed director, Kelly owed fiduciary duties to the Company which he breached by facilitating and supporting General Atlantic's pursuit of Emdeon at the expense of ProxyMed; by concealing his conflict of interest from ProxyMed; by misleading the Company into believing General Atlantic would participate in financing its acquisition strategy; and by failing to correct his prior representations that General Atlantic would provide financing for ProxyMed's acquisition efforts. General Atlantic aided and abetted Kelly's breach of fiduciary duty by, *inter alia*, directing Kelly to aid in its pursuit of Emdeon at the expense of ProxyMed and by engaging in acts which concealed Kelly's and General Atlantic's conflict of interest from ProxyMed.

## JURISDICTION AND VENUE

5. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) as there is complete diversity of citizenship among the parties as set forth below and the amount in controversy exceeds $75,000, for the reasons set forth in the Stipulation and Order Regarding Parties' Citizenship, dated June 14, 2013 and so ordered on June 18, 2013..

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) (3) as General Atlantic was subject to the personal jurisdiction of this Court at the time this action was filed.

## THE PARTIES

7. The Liquidating Trustee may bring this action pursuant to paragraph 7.5 of the Plan of Liquidation and the Liquidating Trust Agreement, attached as Exhibit A to the Notice of Filing Plan Supplement, filed on July 7, 2009 in the BR Court (BR Court Dkt. #679), both of which the BR Court approved on July 15, 2009 (BR Court Dkt. #696). Pursuant thereto, the Debtor transferred to the Liquidating Trust, *inter alia*, all "Remaining Actions" and the

Liquidating Trustee was empowered to investigate and prosecute any "Remaining Actions." This action qualifies as a "Remaining Action" as defined in paragraph 1.76 of the Plan of Liquidation. The State of formation and principal place of business of the Liquidating Trustee is Pennsylvania. At the time of the filing of the Original Complaint, Plaintiff had only one member, a citizen of Pennsylvania.

8. At all relevant times, General Atlantic has been a Delaware limited liability company with its principal place of business in Greenwich, CT, and owned, directly or through other entities it controlled, at least 26 percent of the equity and voting control over the Company. General Atlantic is a private equity investment firm that acquires major stakes in its portfolio companies, which have been primarily involved in information technology businesses. At the time of the filing of the Original Complaint, General Atlantic's only offices in the United States were located in Connecticut, New York and California and none of the members of General Atlantic or members of members of General Atlantic are citizens of the State of Pennsylvania. Accordingly, there is complete diversity among the parties.

9. At all relevant times, Defendant Kelly, who had been with General Atlantic since 1995, was a Managing Director of General Atlantic and its designee to the Board of Directors of ProxyMed. As of February 3, 2006, Defendant Kelly became Chairman of the ProxyMed Board of Directors. Kelly belatedly resigned from the ProxyMed Board effective October 5, 2006 due to a conflict of interest. The actual conflict of interest had arisen months earlier but remained undisclosed to ProxyMed until the public announcement of General Atlantic's $1.2 billion purchase of a 52 percent ownership interest in Emdeon's Business Services segment on September 26, 2006. At all relevant times, including when this action was commenced, Kelly has been a citizen of the State of California.

## **BACKGROUND FACTS**

10.    ProxyMed was initially incorporated in Florida in 1989, as an electronic healthcare transaction processing services company which provided connectivity, cost-containment services and related value-added products to physician offices, payers, medical laboratories, pharmacies and other healthcare institutions.  The Company's business strategy was to leverage its leadership position in connectivity services in order to establish it as the premier provider of automated financial, clinical, cost containment, business outsourcing solutions, and administrative transaction services primarily between healthcare providers and payers, to clinical laboratories and pharmacies.  In 2002, ProxyMed's business fell into two segments: (i) Transaction Services; and (ii) Laboratory Communication Solutions.  Transaction Services included transaction, cost containment and other value-added services principally between physicians and insurance companies, and physicians and pharmacies.  Laboratory Communication Solutions included the sale, lease and service of communication devices principally to laboratories and the contract manufacturing of printed circuit boards and other value-add services.

### General Atlantic's Investments in ProxyMed

11.     On March 27, 2002, General Atlantic entered into a Stock and Warrant Purchase Agreement with ProxyMed by which it acquired, for $25 million, 1,569,366 unregistered shares of ProxyMed common stock at $15.93 per share, and warrants to purchase an additional 549,279 shares of ProxyMed common stock at the same offering price, exercisable after April 5, 2003 and prior to April 5, 2004. The shares were subject to "piggy-back" registration rights commencing on April 5, 2003.  In votes by General Atlantic on ProxyMed matters put before the shareholders, General Atlantic was entitled to vote the 549,279 shares subject to the warrants, giving it 29 percent of the ProxyMed vote.

12.     Pursuant to the Stock and Warrant Purchase Agreement, General Atlantic was entitled to: (a) appoint up to two of its designees to the ProxyMed Board so long as it maintained ownership of at least 5 percent of the shares of common stock outstanding as of any date (assuming the exercise of all of the Warrants); (b) have its designees serve on each committee of the Board in accordance with applicable securities laws and Nasdaq regulations; (c) have the right to designate one observer who had the right to attend all regular, special and telephonic meetings of the Board (except to the extent that such attendance would negate any attorney-client privilege); and (d) have its representatives visit and inspect any of the Company's offices, copy any of the Company's corporate and financial records and discuss the Company's affairs, finances and accounts with its directors and officers.

13.     Pursuant to this agreement, Kelly, a Managing Member of General Atlantic, was appointed a member of the ProxyMed Board of Directors and acted as General Atlantic's agent to represent its interests. Nonetheless, as a board member,  he owed fiduciary duties of loyalty to the Company.  In addition, other General Atlantic representatives attended ProxyMed Board

meetings from time to time. Further, General Atlantic regularly requested and received detailed financial information regarding the Company.

14.     Specifically, according to ProxyMed's Proxy Statement filed with the S.E.C. on April 22, 2002, Kelly was appointed to the ProxyMed Board at that time. Due to his position as a Managing Member of General Atlantic, ProxyMed treated Kelly as the beneficial owner of all of the shares of ProxyMed that General Atlantic owned.

15.     As of March 28, 2003, General Atlantic was the beneficial owner of 2,118,645 ProxyMed shares, representing 28.9 percent of the voting interests in the Company. This number includes the shares subject to the warrants and 6,250 shares issuable upon exercise of currently exercisable stock options for Kelly. On July 8, 2003, General Atlantic received an additional 243,882 warrants.

16.     On December 5, 2003, ProxyMed entered into an agreement to acquire all of the outstanding capital stock of PlanVista Corporation ("PlanVista"), a publicly-held company with locations in Tampa, Florida and Middletown, New York, for 3,600,000 shares of ProxyMed common stock. PlanVista provided medical cost containment and business process outsourcing solutions, including claims re-pricing services, for the medical insurance and managed care industries, as well as services for healthcare providers, including individual providers, preferred provider organizations and other provider groups. The PlanVista acquisition closed on March 2, 2004.

17.     General Atlantic was a significant participant in financing this acquisition. Specifically, on March 2, 2004, General Atlantic and certain other investors purchased an aggregate of 1,691,227 shares of unregistered ProxyMed common stock at $14.25 per share in a private placement which raised approximately $24.1 million. These proceeds were used with

other available funds to retire certain debts of PlanVista and to fund certain costs associated with the Company's acquisition of PlanVista.

18.     On March 25, 2004, General Atlantic exercised the original two-year warrants it was granted in 2002 for the purchase of 549,279 shares of common stock for $8.75 million in cash.

19.     Due to the PlanVista financing and warrant exercise, as of April 12, 2004, General Atlantic owned 3,381,802 shares of ProxyMed common stock, representing 26.8 percent of the Company's outstanding shares. Kelly beneficially owned 3,399,511 shares, representing 26.9 percent of the outstanding shares, which included the shares General Atlantic owned and 17,709 shares issuable upon exercise of stock options Kelly had received.

20.     As of April 20, 2005, General Atlantic owned 3,381,802 shares of ProxyMed common stock, representing 26.8 percent of the Company's outstanding shares. Kelly beneficially owned 3,415,969 shares, representing 27 percent of the outstanding shares, which included the shares owned by General Atlantic and 34,167 shares issuable upon exercise of stock options Kelly had received.

21.     On April 18, 2005, ProxyMed entered into a loan and security agreement (the "Loan Agreement") with Wachovia Bank, National Corporation. Under the terms of the Loan Agreement, the Company was allowed to borrow, from time to time, up to $15 million on or before June 29, 2006, and up to $12.5 million thereafter.

22.     In December 2005, ProxyMed announced that it would begin doing business under a new operating name, MedAvant Healthcare Solutions. This newly launched corporate identity united all business units and employees under one brand identity ("MedAvant") and

resulted from a strategic analysis ProxyMed completed in the third quarter of 2005 following the acquisition of seven companies between 1997 and 2004.

### General Atlantic's Control Over the Hiring of ProxyMed's CEO

23.    When ProxyMed sought out a new CEO in the spring of 2005, ProxyMed's then President, Nancy Hamm, sought a meeting with Kelly, in his capacity as General Atlantic's representative, to lobby for the position.  Kelly directed that ProxyMed pay for Ms. Hamm's travel to San Francisco to meet with him.    Kelly and the senior General Atlantic officers also vetted another early candidate but determined to reject both candidates.  Further evidencing General Atlantic's control over the hiring process, an intended press release relating to the CEO hiring process was first sent to Kelly and Lankford Wade of General Atlantic before it was sent to ProxyMed's Board.  Similarly, General Atlantic and Kelly, acting as General Atlantic's agent, continued to spearhead the CEO selection process, seeking out and ultimately convincing John Lettko to join ProxyMed as its CEO.  Lettko would not have been hired without the approval of General Atlantic.

24.    Specifically, Lettko interviewed over multiple occasions with Kelly and General Atlantic Managing Director David Hodgson.  At Lettko's first meeting with Kelly on March 15, 2005, Lettko asked if General Atlantic was prepared to make additional investments in ProxyMed, and Kelly responded that General Atlantic had not reached the level of investment that it would normally make, and that General Atlantic would provide additional capital as needed.

25.    In addition, on May 5, 2005, Lettko met with Hodgson and Kelly at General Atlantic's Palo Alto office.  At this meeting, both General Atlantic Managing Directors assured Lettko that General Atlantic would provide the necessary capital to assist ProxyMed's and

Lettko's efforts to grow the business. Lettko was also vetted with Steve Denning, the Chairman of General Atlantic, and others at General Atlantic.

26.     Furthermore, Kelly advised Lettko that, as a condition of his employment with ProxyMed, he would have to invest $500,000 of his own money in ProxyMed stock. Before doing so, Lettko again communicated with Kelly to obtain his assurance, as a Managing Member of General Atlantic, that General Atlantic would invest the necessary funds in ProxyMed that Lettko would require to successfully grow ProxyMed's business.

27.     In response to that request, Kelly, acting on behalf of General Atlantic, again confirmed to Lettko in May 2005 that General Atlantic would provide additional funding to ProxyMed and that he had the authority to make such representation on behalf of General Atlantic. Kelly further explained to Lettko that General Atlantic was a multi-billion dollar investment banking company and that General Atlantic's primary purpose is to provide investment banking/financial support with General Atlantic's portfolio companies (such as ProxyMed) and that General Atlantic would absolutely commit the funds that Lettko would need to successfully operate and grow ProxyMed.

28.     Kelly also stated to Lettko in May 2005 that General Atlantic was ProxyMed's largest shareholder and that he (Kelly) was on the ProxyMed Board of Directors as General Atlantic's representative to oversee ProxyMed's business and insure ProxyMed was managed consistently with General Atlantic's interests. Kelly further promised that General Atlantic's continued financial support would constitute the safety net that Lettko required before committing to sign his ProxyMed employment agreement and become CEO of ProxyMed. General Atlantic therefore made it clear to Lettko that General Atlantic controlled the Company.

29.      On May 10, 2005, ProxyMed hired Lettko as its CEO.  Lettko, at the time, had

more than 20 years of CEO and senior executive experience in financial service related

transaction and data transmittal processing, analysis and storage businesses.  The Company's

May 11, 2005 Press Release announcing the appointment of Lettko as CEO  stated:

> May 11, 2005 – ProxyMed, Inc. (Nasdaq: PILL), a leading provider of healthcare
> transaction processing and cost containment services, today announced that John
> Lettko has joined the Company as Chief Executive Officer.  "John is a recognized
> leader in technology services with a track record of executing aggressive growth
> strategies and we are delighted to welcome him to ProxyMed," said Kevin
> McNamara, Chairman of the Board for ProxyMed. "John's appointment comes at
> a critical juncture in the evolution of ProxyMed and we are confident that under
> his leadership, the company will continue its rapid growth and expansion in the
> healthcare technology market."

### General Atlantic Was In a Position of Special Trust and Confidence with ProxyMed

30.      As a result of Kelly's statements to Lettko that he (Kelly) was on the Board to

protect General Atlantic's interests, Lettko spoke with Kelly almost daily from his date of hire

for approval of various courses of action Lettko proposed to take including such mundane

operational issues as staffing and salaries to be offered to new hires.

31.      Once Kelly became acting Chairman of the ProxyMed Board on February 3,

2006, while still acting as General Atlantic's representative, he became even more involved in

overseeing ProxyMed management's approach to the strategic and operational issues facing the

Company.  Lettko vetted virtually all significant corporate decisions with Kelly.

32.      In a February 25, 2006 e-mail from Kelly to Steve Denning, Kelly stated

"MedAvant [and others] receiving more time and attention from me than ever (which you know

was already significant in the past)."  Consistent with this statement to Denning, Kelly had, *inter*

*alia*, significant involvement, on behalf of General Atlantic, in strategic issues re Plan Vista;

employee hiring decisions; employee compensation; trademark issues facing the Company; the

Company's Investor Relations presentations; and Company press releases.

33.     Kelly also provided Company financial data to General Atlantic to perform analyses of ProxyMed projections and valuations.  When Lettko could not reach Kelly, he would contact Drew Pearson, an officer of General Atlantic, to clear business decisions.

34.     On the single occasion when Lettko, on behalf of ProxyMed, did not consult General Atlantic in advance of a corporate decision and entered into an agreement to acquire a small company known as Zeneks, Inc. (publicly announced on February 14, 2006), Kelly soundly rebuked him for not first clearing it with Kelly .  Thereafter, Lettko ran each and every strategic or operational decision by Kelly before implementing it.

35.     Further evidencing the special position of trust and confidence General Atlantic had with ProxyMed, as stated in General Atlantic's marketing materials to prospective investors:

> Once we are invested in a company, we work closely with management to build value in a number of ways.  <u>In addition to capital, GA provides extensive expertise and strategic assistance to our portfolio companies through the active role we play as board members.</u>  Finally, over our long-term investment horizon, we work with management to find the best way for us to balance building value within the company and realizing liquidity for our capital partners.

(emphasis added.)

36.     In addition, in emphasizing the advantages to a target company of an investment by General Atlantic, General Atlantic's February 2006 marketing materials stated that:

- "We provide active value-added assistance to our companies in many areas including corporate strategy, organizational development, executive search, global expansion, technology/product development, business development and finance/accounting."

- "We believe in a long-term partnership with management, which is reflected through our track record of working with existing management to build market leaders."

In amplifying on its "Partnership Approach", General Atlantic went on to state:

- "GA's partnership approach is critical to our investment philosophy.  Our success is predicated on the quality of relationship with management."

- "We are active as board members and resource partners for all of our companies."

- "The size of our capital base allows us to fund companies through their development. We are available to provide follow-on investment as companies grow."

- "We are patient investor.  Our commitment is long term and ranges from 5 to 10 years.  We generally hold our investments for a longer period post-IPO than the time prior to an IPO."

In amplifying on the strategic assistance it provides to all of its portfolio companies, General Atlantic emphasized that the strategic assistance it provides is broad based and includes the "Development of overall strategic plan," "Organizational structure and development," "Assistance in attracting and hiring world class management," "Market entry strategies," and "Proactively mapping potential acquisitions."

37.    General Atlantic required Lettko to provide periodic updates at its headquarters in Greenwich, CT.  Confidential information, including strategic plans, concerning the Company was discussed at these meetings.

38.    General Atlantic also became directly involved in such issues as assisting the Company in securing a $20 million financing agreement with Laurus Master Fund, LTD ("Laurus") on or about December 7, 2005; the content of ProxyMed SEC filings; potential collaboration between ProxyMed and other General Atlantic portfolio companies; securing a new Chairman of the Board's Audit Committee in January 2006; and  hiring a new General Counsel over the resistance of several Board members.  In addition, besides Kelly,

representatives of General Atlantic, including Lankford Wade and Peter Munzig, attended ProxyMed Board meetings from time to time.

39.     General Atlantic approved Kelly's assuming the position of Acting Chairman of the Board of ProxyMed as of February 3, 2006.  The Press Release announcing his appointment, which General Atlantic reviewed and edited, quoted Lettko as stating: "we are pleased that Braden has taken on the role of Chairman and know that he will provide the leadership to build our board of directors and continue providing us with strategic guidance for growth."

40.     As a result of the active role it played in ProxyMed's operations and plans, General Atlantic, through Kelly and others, assumed a position of trust and confidence which gave rise to fiduciary duties to ProxyMed.

### ProxyMed and Emdeon Were Blood-Thirsty Competitors

41.     ProxyMed identified Emdeon Corporation as one of its significant competitors in its Form 10-K for its fiscal year ending December 31, 2005.  Similarly, Emdeon identified ProxyMed in its Form 10-K for its fiscal year ending December 31, 2005 ("2005 10-K") as one of its significant competitors to its Business Services segment.

42.     In fact, they were blood thirsty competitors with a history of bad relations between them.  For example, in 2005, Emdeon had adopted a strategy of seeking exclusive contracts for electronic claims processing with insurers to the exclusion of companies such as ProxyMed.  To circumvent Emdeon's exclusive contracts, ProxyMed continued to electronically process claims for Aetna through another company that Emdeon had not barred.  In the fall of 2005, Emdeon pressured Aetna to cease doing any business with ProxyMed.  In response, ProxyMed threatened to provide physician claims to Aetna on paper, rather than electronically.

When Emdeon did not back down, ProxyMed commenced submitting physician claims to Aetna by paper.

43.     In December 2005, ProxyMed also commenced a lawsuit against Emdeon, for predatory pricing policies as well as tortious interference with ProxyMed's business. Negotiations commenced between ProxyMed and Kevin Cameron, CEO of Emdeon, who due to the pressure from Aetna, and the lawsuit filed by ProxyMed, backed down and thereby allowed ProxyMed to resume processing Aetna claims electronically.  The lawsuit was withdrawn without prejudice in early 2006 and Emdeon agreed to cease and desist from communications with ProxyMed's clients.  The lawsuit, the facts giving rise to it, and the resolution of it led to significant resentment by Emdeon's CEO of ProxyMed and continued to infect their relations thereafter.  Kelly and General Atlantic were aware of these facts.

### ProxyMed Begins 2006 Well-Positioned to Prosper

44.     Due to Lettko's leadership, ProxyMed was well positioned in 2006 to prosper. According to its Form 2005 10-K, ProxyMed was "the nation's second largest provider-based healthcare technology company with connections to more than 450,000 providers, 30,000 pharmacies, 500 laboratories and over 1,500 payer organizations."  Further, it was "the only healthcare technology company that offers both a nationwide claims clearing house and a nationwide Preferred Provider Organization (PPO) network."  ProxyMed further stated in its 2005 10-K that:

> We are uniquely positioned in our marketplace to make a contribution that our competitors do not. Our differentiators include our proprietary real-time technology, *Phoenix*<sup>SM</sup>, and our ability to offer both a nationwide claims clearinghouse and a nationwide PPO network [known as *NPPN*<sup>TM</sup>]. In addition, we maintain an open, neutral position with vendors, which enables us to attract partners who prefer a non-competitive environment. This allows us to offer more flexible options for our customers. Another differentiator is our deep footprint in the clinical arena. With the nation's largest clinical laboratories as long-time

customers, we have worked in partnership with them to develop customized lab communication tools and services such as *Pilot*™. Also, our prescription business operates one of the nation's largest and longest-established electronic and fax gateway infrastructure with extensive connectivity to all major pharmacies in the nation.

**General Atlantic Pursues Emdeon While Providing False Assurances To ProxyMed That It Would Finance ProxyMed's Growth Strategy**

45.     On February 16, 2006, Emdeon Corporation announced that it had received inquiries regarding the acquisition of its Emdeon Business Services and Emdeon Practice Services segments and that it was evaluating strategic alternatives relating to these businesses to maximize shareholder value.  As a result of this announcement, General Atlantic retained the firm of William Blair & Co. to act on its behalf in approaching Emdeon.

46.     Lettko also took notice of Emdeon's announcement and, notwithstanding the bad blood between the companies, suggested to Kelly that General Atlantic consider proposing a merger of ProxyMed and Emdeon.  Based on Kelly's discussions with others at General Atlantic, General Atlantic directed John Kibler of William Blair to include this possibility in their proposal to Emdeon's investment bankers, Blackstone Group.  Accordingly, on March 8, 2006, John Kibler advised Harold Baron of the Blackstone Group of General Atlantic's interest in funding a transaction that would merge Emdeon's Business Services segment with ProxyMed or General Atlantic's making a stand-alone investment in Emdeon that may or may not involve other General Atlantic portfolio companies.

47.     Lettko, however, learned on March 9, 2006 that ProxyMed was being excluded from consideration as a merger candidate with Emdeon – an outcome Lettko did not consider surprising given the competitive dynamic between the two companies.

48.     Within the very next week, on March 15, 2006, after speaking with Marty Wygod, the Chairman of Emdeon, Kelly advised Jonathan Korngold (a Principal of General

Atlantic and head of its Global Healthcare sector) and William Ford (President of General Atlantic) that Emdeon did not have any interest in being acquired by ProxyMed and that General Atlantic was free to pursue an investment in ProxyMed's most significant competitor, Emdeon, on its own. Thereafter, Kelly repeatedly represented to ProxyMed that General Atlantic would provide or participate in the financing necessary for ProxyMed's growth plans. At the same time, Kelly gave no indication to ProxyMed that General Atlantic was seeking to secure a transaction with Emdeon – which would take every opportunity available to destroy ProxyMed's competing business given Emdeon's competing interests and the bad blood from the situation with Aetna described above.

49.    On March 20, 2006, without any knowledge by ProxyMed, General Atlantic determined that CompuGroup, another of General Atlantic's portfolio companies and based in Europe, should express interest, with General Atlantic's support, in purchasing both of Emdeon's segments with a strategic partner. During the first two weeks of May, 2006, General Atlantic's internal MD [Managing Director] Weekly Updates (to which Kelly provided input) indicated that CompuGroup was engaged in due diligence regarding both segments of Emdeon. Subsequently, Emdeon determined to first deal only with the sale of its Practice Services segment for which CompuGroup bid in late June.

50.    Without any knowledge of General Atlantic's conflict of interest arising from its pursuit of Emdeon, in May 2006, Lettko developed a plan, which he first presented to Kelly for approval, to dramatically grow ProxyMed's NPPN (PPO) business by increasing the proportion of direct contracts with providers as compared to indirect contracts over leased networks. Not only would this give the Company greater scale to compete against other PPOs, but the direct

contracts were more profitable than indirect contracts which involved "middle-men" that took a cut of the revenues.

51.     Lettko proposed implementing this strategy by acquisitions and laid out this strategy at the Company's May 2006 Board meeting.  At that meeting, Lettko specifically raised with Kelly the need for General Atlantic to provide financing to pursue this strategy.  In response, Kelly stated at that Board meeting that General Atlantic would "either lead the financing or follow the financing," meaning that General Atlantic would participate in financing led by another to maintain General Atlantic's percentage interest in the Company. Kelly would not have made this representation without the knowledge and approval of General Atlantic.

52.     In furtherance of that strategy and in reliance on Kelly's statement at the May Board meeting, on June 13, 2006, Lettko discussed with ProxyMed's Board, including Kelly, two potential acquisitions – Medical Resource, LLC and PPONext.  ProxyMed, at the time, was in the top ten of PPO providers and both acquisitions would greatly expand and solidify the Company's PPO business.  Lettko believed that expanding the Company's PPO business would be its best way to maximize shareholder value in the short to medium term.  The PPONext acquisition, however, was by far the more important one to ProxyMed's growth strategy.  The PPO market, at the time, was highly fragmented.

53.     Further, Lettko believed that putting its own PPO (NPPN) under one roof with PPONext, and InterPlan (another potential PPO acquisition) would create greater value.  Lettko's plan was to replicate the business strategy employed by another ProxyMed competitor for its PPO business, MultiPlan, which General Atlantic had then just sold by for $1 billion.  Kelly had no affiliation with MultiPlan and neither Kelly nor General Atlantic engaged in any specific acts

to advantage MultiPlan at the expense of ProxyMed.  This sale price represented a multiple of 4.5 times revenues, 10 times trailing EBITDA and 11 times future EBITDA.

54.      Given, *inter alia*, Kelly's unqualified assurance, on behalf of General Atlantic, at the May Board meeting of General Atlantic's financing – which representations he did not retract or modify – and the passage of time without any announced transaction involving General Atlantic, ProxyMed justifiably believed that General Atlantic was not pursuing a transaction with Emdeon independent of ProxyMed.  This belief was further reinforced by the fact that such a transaction with Emdeon would have created a massive conflict given the significant competition between Emdeon and ProxyMed and General Atlantic's pursuit of such a transaction would have required Kelly to at least provide notice to ProxyMed that it needed to make other plans for financing its acquisition plans.

55.      Efforts by Lettko to conclude an acquisition of PPONext (code-named Chameleon) continued in July and Lettko enlisted Kelly to assist him in closing the deal with Chameleon investors because Kelly was a managing director of General Atlantic and its expected role in financing the acquisition.

56.      In late July 2006, General Atlantic's efforts to acquire Emdeon's Practice Services segment (which were unknown to ProxyMed) – which did not compete directly with ProxyMed – fell to another buyer.  However, on August 1, 2006, General Atlantic – with Kelly's knowledge – determined to acquire a majority stake in Emdeon's Business Services segment which did directly compete with ProxyMed.

57.      Emdeon, however, was concerned about General Atlantic's conflict, given its investment in ProxyMed.  On August 1, 2006, it raised concerns as to General Atlantic's ownership stake in its competitor ProxyMed and sought assurances from General Atlantic that

General Atlantic's interest in ProxyMed would not provide any impediment to consummating a deal with Emdeon. Shockingly, General Atlantic directed Kelly – still Chairman of the ProxyMed Board – to alleviate Emdeon's concerns about General Atlantic's pursuit of this directly competing business.

58.     Specifically, on August 3, 2006, at the request of General Atlantic, and in breach of his fiduciary duties to ProxyMed, Kelly spoke with Martin Wygod, Chairman of the Board of Emdeon, to assure Emdeon that ProxyMed would not be an impediment to General Atlantic's efforts to acquire Emdeon's Business Products segment. On the same day, Kelly reported on his conversation with Wygod to virtually all of the senior officers of General Atlantic. Such officers included Steve Denning (its then Chairman and member of General Atlantic's Portfolio Review Committee ("PRC"), responsible for making decisions concerning General Atlantic's portfolio companies, including ProxyMed), William Ford (the President of General Atlantic and also a member of the PRC), Jonathan Korngold (who was heading up the Emdeon investment), Matthew Nimetz (also a Managing Director and member of the PRC) and Dave Hodgson, who was the Chairman of the PRC. Kelly knew or consciously disregarded that his conversation with Wygod to further General Atlantic's ability to acquire Endeon created a conflict of interest for him. Kelly, however, concealed that conflict of interest from ProxyMed.

59.     Kelly thereafter had several conversations with Lettko regarding the PPONext acquisition on, among other dates, August 10, 2006 and August 16, 2006, during which a cost of the acquisition of $10 million in cash plus $5-8 million in stock was discussed. Therefore, Kelly knew the magnitude of the financing ProxyMed would be seeking from General Atlantic, but did not retract or modify his prior representations of General Atlantic's commitment to participate in financing this acquisition strategy. Such a disclosure was required because Kelly

had full knowledge that General Atlantic was proceeding with its intent to invest in Emdeon's Business Services segment, and, given the acrimony and direct competition between the two companies, he therefore knew or should have known that General Atlantic would not provide any financing to ProxyMed if it invested in Emdeon.

60.     On August 3, 2006, Jonathan Korngold and his healthcare team met with Emdeon's investment bankers, Blackstone Group, Kevin Cameron (Emdeon's CEO) and members of Emdeon's management team, to review a detailed financial package on Emdeon. Following the meeting, Korngold advised Bill Ford that the "meeting went very well today. Business seems to be much better than we had anticipated." Korngold determined to move forward with pursuit of the investment on that day.

61.     On August 8, 2006, ProxyMed reported its second quarter financial results. Specifically, the Company reported a significant improvement in operating results with an operating loss for the second quarter of $1,043,000 compared with an operating loss for the prior-year period of $2,466,000. In addition, it reported that EBITDA for the second quarter increased 690.3 percent to $814,000 compared with $103,000 for the prior-year period. ProxyMed also reported on August 8, 2006 that it had entered into a three-year processing agreement with MD On-Line, a provider of products for electronic healthcare transactions between providers and payers, to use ProxyMed for claim and real-time transaction processing. ProxyMed further stated that "based on the expected transaction volume associated with the agreement, MD On-Line is expected to become one of MedAvant's top 5 transaction processing customers." Significantly, MD On-Line's business was secured at the expense of Emdeon, which had previously serviced its transactions.

62.     On or about August 9, 2006, and unknown to ProxyMed, General Atlantic sent information on ProxyMed to two entities – Nova Capital Management Ltd. ("Nova") and Signal Equity Partners – in furtherance of its efforts to sell General Atlantic's stake in ProxyMed. Drew Pearson was the General Atlantic point person for these efforts. Kelly was also apprised of this effort, as discussed below.

63.     On August 16, 2006, ProxyMed reported to General Atlantic that its EBITDA for the month of July 2006 was $512,000, approximately $300,000 more than forecast. Pearson considered this to be a positive result.

64.     General Atlantic's internal August 18, 2006 MD Weekly report which regularly reported on, *inter alia*, the status of General Atlantic's pursuit of a majority interest in Emdeon's Business Services segment stated: "Moving forward with term sheet to drive towards exclusive period of confirmatory diligence." On August 23, 2006, General Atlantic sent Emdeon the initial term sheet for the proposed transaction. And, the August 25, 2006 MD Weekly added "deep diligence underway this week . . . . Very positive discussion around key items in term sheet – clear they want to do a deal with us. Working to secure exclusivity."

65.     Meanwhile, by August 29, 2006, the principal financial terms for ProxyMed's acquisition of PPONext had been agreed upon ($10 million in cash and $6.5 million in ProxyMed stock) and a letter of intent was being prepared. Kelly was fully apprised of these developments. Nonetheless, he continued to conceal his and General Atlantic's substantial conflicts of interest from ProxyMed and failed to retract or modify his prior representations as to General Atlantic's willingness to participate in financing ProxyMed's acquisition strategy.

66.     Furthermore, on August 30, 2006, Kelly divulged ProxyMed's plan to acquire PPONext to Korngold even though Kelly knew Korngold was heading up GA's potential

investment in Emdeon, thereby evidencing the lack of any "wall" between General Atlantic's

investment in ProxyMed and planned investment in Emdeon.

67.    On September 1, 2006, Kelly provided an update on ProxyMed to Steve Denning,

Bill Ford, Dave Hodgson and Drew Pearson stating, in part, that:

> \* Lettko's 1 yr anniversary has come and gone. I continue to be pleased with his mgt of
> the company in a tough situation.

> \* Ship appears to have stabilized.  Results coming in better in Q3 than Q2.EBITDA on
> track to exceed $1.5 million for the quarter.

He also pointed out the synergies that would be realized by the acquisition of PPONext stating

that "Lettko and Jim Pennington, PPONext's CEO who will remain with the combined company,

believe there is at least $6 million of synergies that can be realized."  Kelly further advised his

partners that Lettko would be visiting them soon concerning financing the transaction.

68.    At the same time, General Atlantic's secret pursuit of the Emdeon transaction –

the largest investment in the firm's history – was proceeding.  General Atlantic's Sept. 1, 2006

MD Weekly reported in part:

> Term sheet negotiations nearly done and progressing nicely.  Call set for
> tomorrow with CEO [Kevin Cameron]/Marty [Wygod] to discuss the valuation,
> structure, and timing we are prepared to step into if granted exclusivity, which we
> are hopeful we will receive.  Business diligence and financing discussions
> proceeding well.Target signing for end of Sept.  GA equity check likely to be in
> the $250 - $350m range depending on amount of leverage used.

69.    On September 2, 2006, Korngold updated Bill Ford as to the latest developments

with the prospective Emdeon investment.  Specifically, Korngold advised Ford that he had just

gotten off the phone with Wygod and Cameron and that they had said that "the deal is ours

provided that we stay with the originally discussed $1.5 billion valuation."  Korngold also

reported that Emdeon was not willing to grant General Atlantic formal exclusivity because

Emdeon had "credible offers from a couple of large PE [Private Equity] firms at this price and

governance" and needed to protect itself in case General Atlantic backed out at the last minute. Korngold summed up by asking Ford to add the potential Emdeon transaction to the agenda for the Investment Committee meeting scheduled for September 5, 2006.

70. Any investments in new companies by General Atlantic were first vetted by its Investment Committee. This included General Atlantic's investment in Emdeon's Business Services segment. During this time, a majority of the Investment Committee consisted of Bill Ford (who Co-Chaired it), Steve Denning, Dave Hodgson and Mark Dzialga, the first three of whom were also on General Atlantic's PRC, which oversaw General Atlantic's investment in ProxyMed. Despite competing interests, General Atlantic continued to fail to create effective "walls" to protect ProxyMed from the overwhelming conflict created by General Atlantic's pursuit of Emdeon's Business Products segment, with a projected return that dwarfed its investment in ProxyMed by over eight times. Furthermore, General Atlantic kept ProxyMed in the dark about its conflict, except for Kelly, who was a participant in developing the Emdeon investment.

71. On September 2, 2006, in anticipation of an Investment Committee meeting scheduled for September 5, 2006, the members of General Atlantic's Investment Committee received a detailed memorandum prepared by Korngold and his team recommending that General Atlantic proceed with a purchase of a majority interest in Emdeon's Business Products segment under the terms that were being negotiated. Pearson also received a copy of the memorandum. The transaction was code named "Project Eagle." At the September 5, meeting, the Investment Committee determined to proceed with Project Eagle subject to further due diligence.

72.     Three days later, on September 8, 2006, Drew Pearson informed Kelly that General Atlantic was pursuing the sale of ProxyMed to Nova Capital.  This was not disclosed to ProxyMed nor did Kelly retract his earlier representations of support, and Kelly still did not advise ProxyMed that it could not rely on General Atlantic to provide any financing to consummate ProxyMed's intended acquisitions.

**ProxyMed Approaches General Atlantic to Honor Its Prior Financing Commitment But General Atlantic Engages in Delay Tactics To Enable it to Conclude Its Agreement with Emdeon**

73.     ProxyMed held a telephonic Board Meeting on September 6, 2006 to discuss, among other things, the financing of the PPONext acquisition.  Unbeknownst to ProxyMed, however, General Atlantic was in advanced discussions to acquire a 52 percent stake in Emdeon, was deep in conducting its due diligence on Emdeon's Business Services segment, and was evaluating financing alternatives for its investment in Emdeon.  Kelly still remained silent as to General Atlantic's conflict and its willingness to provide financing.

74.     On September 6, 2006, with a letter of intent from PPONext to be acquired by ProxyMed nearly in hand, based on Kelly's prior representations, Lettko e-mailed Drew Pearson to request a meeting with Bill Ford, Dave Hodgson and him concerning General Atlantic's financing ProxyMed's planned acquisitions.  Pursuant to the PPONext Letter of Intent, ProxyMed required funding by October 20, 2006 to close the PPONext acquisition.  Specifically, in explaining ProxyMed's financing requirements, Lettko wrote:

> We are in process with 2 acquisitions, both in the PPO space to grow our provider mix from 30%/70% direct/indirect to 70%/30%, adding revenue and EBITDA as well.  One is small enough to do using our existing debt facility with Laurus ($5M).  The other is not ($16.5M).  We'll likely be looking to raise $15-20M in equity and have a short timeframe (45 days).  The synergies are very persuasive and we already use both companies in our leased network.

> These two deals will significantly improve our operating economics of our PPO business and will enable us to focus on building out our longer term strategic play at the nexus of payer/provider/patient claims reimbursement and the payment and data that drive it.

I appreciate your assistance.

(emphasis added).

75.     On September 7, 2006, Drew Pearson invited Lettko to meet with him, Bill Ford and David Hodgson (by video) on September 13, 2006.  At the time, however, General Atlantic had no interest in providing any financing to acquire PPONext which would make ProxyMed a more formidable competitor of Emdeon and which could jeopardize General Atlantic's expected return from its investment in Emdeon.  Thus, General Atlantic agreed to hold this meeting based on false pretenses given that General Atlantic was in the final stages of completing its efforts to acquire 52 percent of Emdeon's Business Services segment and had already determined to dispose of its investment in ProxyMed.  Drew Pearson made this clear in his e-mail to Bill Ford and David Hodgson on the same date, in which he stated:

> Probably a long shot in terms of our investment interest, but can either of you meet with Lettko next Wednesday?  Even if we're not interested, it would probably be good to get a more detailed update on the business

(emphasis added.)

Further, given the volatile and acrimonious relationship between Emdeon and ProxyMed as described above, it was in General Atlantic's interest to delay ProxyMed from securing any financing that would have to be publicly reported by it prior to the execution of an agreement with Emdeon.

76.     Rather than participating in this meeting with an eye towards benefitting ProxyMed, General Atlantic viewed the meeting as an opportunity to benefit itself at ProxyMed's expense by getting a detailed update on ProxyMed's business as General Atlantic

closed in on completing its Emdeon investment and was attempting to sell its stake in ProxyMed to Nova or another party. Had ProxyMed known of General Atlantic's true intentions it would not have revealed its acquisition plans to General Atlantic. Furthermore, ProxyMed would have sought alternative financing arrangements at least a month earlier without relying on General Atlantic – which was hopelessly conflicted given that the principal General Atlantic players could not divorce their desire to close the firm's largest deal in history from the interests of ProxyMed in securing needed financing.

77.     Indeed, in setting up the ProxyMed meeting, after an internal email exchange about the logistics and need to maintain a "wall" for General Atlantic's Emdeon acquisition team, Pearson aptly stated on September 7, 2006, that "I don't think we really have anyone on the [ProxyMed] team to wall off." In making this statement, Pearson knew that the ProxyMed team consisted of himself, Ford, Hodgson, Denning and Kelly, all of whom had knowledge of the Emdeon transaction in which each had a strong interest and which was moving quickly toward conclusion.

78.     The September 9, 2006 MD Weekly report provided the following update re Emdeon: "full court press now to drive to signing definitive documentation by Sept 25th. Productive meeting with [Emdeon's] Chairman today. Key week of confirmatory diligence with management beginning this weekend. Working on financing package."

79.     As the agenda for the due diligence meeting to be held on September 11, 2006 indicated, however, there remained a number of issues to be vetted before General Atlantic would be prepared to sign an agreement with Emdeon on September 25. These included a review of the top customers in each business segment, which accounted for 75 percent of revenue; review of the pipeline and backlog by segment; review of material contract losses;

review of financial results for Q1, Q2 and for the first two months of Q3; review of the budget

and 2007 forecasts; detailed review of balance sheet items; and discussion of the EBS budgeting

process. General Atlantic also had a number of questions concerning the providers with whom

EBS did business. Critically, the review also focused on the competition between Emdeon and

ProxyMed including the competition between them for electronic claims processing for

pharmacies.

       80.     General Atlantic met with ProxyMed on September 13, 2006. In addition to

Pearson, Ford and Hodgson, Denning participated on behalf of General Atlantic. Lettko, Doug

O'Dowd (CFO), Peter Flemming (General Counsel) and Emily Pietzrak (EVP for Corporate

Communications and Investor Relations) attended on behalf of ProxyMed. During the meeting,

ProxyMed made an extensive slide presentation covering ProxyMed's financial condition,

products, strategy, pipeline opportunities, the details and merits of the planned acquisitions, pro-

forma impact of the acquisitions, and long-term picture of the Company. The slide presentation

materials specifically set forth the transformative benefits of ProxyMed's proposed acquisitions.

PPONext would add 500,000 providers including 3,700 hospitals to ProxyMed's PPO, and MRI

would add direct contracts with 174,000 providers, including 1,922 hospitals. In contrast, the

September 2, 2006 Investment Committee memorandum indicated that Emdeon's Business

Services segment maintained relationships with 5,020 hospitals – <u>less than the number of

hospitals with which ProxyMed would have relationships if it acquired PPONext which would

have totaled 9,272.</u>

       81.     As General Atlantic knew from the September 13, 2006 ProxyMed presentation,

the net effect of both transactions was to transform ProxyMed's business from having direct

contracts accounting for only 30 percent of its PPO business to having direct contracts

accounting for 70 percent of its PPO business. Further, these direct contracts would also have

benefitted ProxyMed's EDI business through cross-selling opportunities. Thus, these

acquisitions posed a direct and significant competitive threat to Emdeon, as would have been

apparent to the General Atlantic team. Furthermore, with both PPONext and MRI, and the

resulting synergies, ProxyMed expected to a profit of $8.9 million in 2007 and $2.8 million in

2008. ProxyMed also provided General Atlantic with detailed back-up, in electronic form, for

the projections set forth in the slide presentation. General Atlantic also knew that ProxyMed's

furture depended on consummating both of these acquisitions as without them, ProxyMed would

not have the margins and scale with which to be an effective competitor.

     82.    No one from General Atlantic made any mention at the meeting of any conflict

General Atlantic had arising from General Atlantic's intent to acquire ProxyMed's largest

competitor and to divest its interest in ProxyMed. No one from General Atlantic retracted or

modified Kelly's prior representations of financial support for ProxyMed. To the contrary,

General Atlantic certainly did not want ProxyMed to secure the needed financing from anyone

prior to September 25 as General Atlantic did not want to risk disrupting the Emdeon deal by

bolstering ProxyMed's competitive stature. At the conclusion of the September 13 meeting, Bill

Ford advised ProxyMed that he would get back to Lettko as to General Atlantic's financing

commitment, but thereafter tried to delay ProxyMed by avoiding contact with Lettko.

     83.    Accordingly, while ProxyMed was completely in the dark about General

Atlantic's intent to divest its interest in ProxyMed and acquire a majority stake in Emdeon,

General Atlantic continued to delay ProxyMed's efforts to obtain financing until General

Atlantic could execute its agreement with Emdeon while deceiving ProxyMed into believing that

General Atlantic would likely participate in the needed financing and was acting in ProxyMed's interests.

84.     While waiting to hear back from Ford after the September 13 meeting with General Atlantic, Lettko sought Kelly's advice and insights as to General Atlantic's position. Far from disclosing General Atlantic's true intentions, on September 14, Kelly continued General Atlantic's deception of ProxyMed by representing to Lettko that while it was unlikely GA was interested in leading the financing, it was "**likely interested** in participating on a pro-rata basis."

85.     Further evidencing Kelly's bad faith as well as the lack of any "wall" between General Atlantic's Emdeon and ProxyMed teams, on or about September 18, 2006, Korngold discussed the merits of the Emdeon investment with Kelly.  A September 18, 2006 e-mail from Korngold to Florian Wendelstadt (another General Atlantic Managing Director and member of the Investment Committee) indicates that Kelly agreed with Korngold that Emdeon's Business Services segment presented a much better opportunity than ProxyMed.  Thus, Kelly confirmed what he undoubtedly already knew -- that General Atlantic would not support in any way ProxyMed becoming a more significant competitor to Emdeon.

86.     On September 15, 2006, Korngold advised Ford that "things [with Emdeon] are moving fast and we expect to be in a position to sign definitive documentation on Monday the 25th, we think that we should add Emdeon to the IC agenda for this Monday [Sept. 18] to update the team on our diligence, which is now nearly complete."  Korngold further suggested that any remaining concerns by the Investment Committee could be addressed early next week.

87.     After several failed attempts to have a telephone call with Bill Ford, Lettko finally spoke with him on September 18 – five days after the meeting at General Atlantic's offices. In

that conversation, even though Ford knew the due diligence on the Emdeon deal was then nearly complete, he made the same misrepresentation as Kelly did at ProxyMed's May 2006 Board meeting – that "General Atlantic would <u>likely</u> follow their money" (meaning participate in financing led by another to maintain their financial interest in the Company) and promised to confer internally and quickly give Lettko a specific commitment on General Atlantic's participation.

88.     Ford's statements to Lettko that General Atlantic would <u>likely</u> participate in any financing on a pro rata basis to maintain General Atlantic's percentage stake in ProxyMed, and that Ford would confer internally and quickly as to General Atlantic's financial commitment were knowingly false.  Ford had no such intent.  There was no internal analysis or discussion of any financing commitment by General Atlantic to ProxyMed during this period of time.  As discussed above, given General Atlantic's nearly concluded agreement with Emdeon and its intention to divest its interest in ProxyMed, General Atlantic had no interest in providing any financing to ProxyMed.

89.     Accordingly, to further delay ProxyMed's pursuit  of a transaction with PPONext while General Atlantic finalized its deal with Emdeon, on September 18, (then only a week before the anticipated signing of an agreement with Emdeon),  Ford advised Lettko that ProxyMed should consider a whole new financing approach in which General Atlantic would ostensibly participate – to sell debt to consummate the acquisition of PPONext and then sell assets (presumably the EDI business that competed with Emdeon) to pay off the debt.  Toward that end, Ford advised Lettko to meet with Allied Capital and also to consider a PIPE financing (a private sale of equity to qualified investors).

90.     In reliance on General Atlantic's repeated statements concerning its "likely" participation in a portion of the financing and failures to disavow its prior representations of support, ProxyMed followed General Atlantic's instructions and arranged meetings with Laurus (its existing lender) and Allied Capital (to explore debt financing), to obtain financing that would be complemented by General Atlantic's participation.  Similarly, given General Atlantic's "likely" participation, Lettko investigated the PIPE option through meetings with William Blair, Banner Capital and America's Growth Capital ("AGC") and General Atlantic at General Atlantic's New York offices with General Atlantic personnel.  A PIPE offering, however was considered a last resort due to its dilutive effect and a negative perception of PIPEs at the time. The focus of the meetings was, consistent with the representations of Kelly and Ford, on securing financing in which General Atlantic would be a participant and not as free-standing financing.  Necessarily, any and all such lenders believed the same and that General Atlantic was fully supporting ProxyMed.

91.     These diversionary meetings with the PIPE bankers took place on Wednesday, September 20, 2006 with Ford's participation. Based on AGC's understanding that General Atlantic was directing the financing effort and would have a role, AGC followed up with Bill Ford later that day to move forward, but Ford did not respond.

92.     Lettko explored the debt option with Bill Ford, Laurus and Allied Capital on Thursday, September 21, 2006.  David Grin of Laurus advised Lettko that it was "comfortable" with providing $4-5 million so long as existing investors (including General Atlantic) provided the other $5 million.  Rob Long of Allied advised Lettko that it would be interested in a larger deal replacing the Laurus $5 million debt as well as potentially $13.1 million in convertible notes

issued to former shareholders of MedUnite, Inc. in connection with ProxyMed's December 2002 acquisition of all of its outstanding stock.

93.     General Atlantic, however, would not permit any of this financing to be secured prior the anticipated signing date for the Emdeon transaction.  Indeed, the day before Ford met with the ProxyMed team on September 21 to discuss the debt option, Korngold advised him that "the full senior management team from Emdeon will join us in NYC this Friday [September 22] at 11:30 am. I expect they will be present/Q&A for 1.5 hours and we can block off time to address any outstanding questions certain IC members may have."  Korngold further advised Ford that he would be circulating an updated detailed analysis on the Emdeon deal to the Investment Committee the following day.  Pearson was also advised by Korngold of the upcoming meeting with Emdeon senior management, received the presentation materials, and attended the meeting.  Thus, General Atlantic's interests in delaying ProxyMed until all the issues with Emdeon were resolved were served by Ford's suggestions that Lettko and ProxyMed consider a debt option and PIPE in which General Atlantic had misleadingly told Lettko it would "likely" participate.

94.     Following the debt meetings on Thursday, September 21, 2006, Lettko outlined the alternatives in an e-mail to Ford that same day.  He described Laurus' interest in financing half of the required $10 million, with General Atlantic participating in financing the balance and Allied's strong interest in debt financing as well as the existence of three investment bankers ready to begin a PIPE.  Ford responded by indicating he would be having dinner with Rob Long of Allied Capital that evening.  Ford directed Lettko to put off retaining any PIPE banker until hearing back from Allied Capital after its Investment Committee met the following Monday – September 25, 2006 – the anticipated day for signing the agreement with Emdeon!

95.    On September 21, 2006, Ford also knew that he would be attending the Emdeon Management presentation on Friday, September 22 and an Investment Committee meeting on Sunday, September 24ᵗ to consider final approval of General Atlantic's investment in Emdeon. Accordingly, Ford continued to delay ProxyMed until the Emdeon transaction could be concluded and concealed the fact that General Atlantic had a conflict and would not participate in any financing while any uncertainty remained with executing the agreement with Emdeon. The benefit that General Atlantic would obtain from the Emdeon deal – and the motive to prevent ProxyMed from doing anything that would poison that deal – the most lucrative deal in General Atlantic's history -- is aptly captured by an email from Korngold to Pearson on September 21ᵗ stating "If Emdeon happens, my quota is full for 3 years." (emphasis added).

96.    Further evidencing General Atlantic's inability to serve ProxyMed's interests, on September 19, 2006, John Gustafson of Ideation Partners, LLC contacted Dave Hodgson about General Atlantic's interest in purchasing an electronic healthcare processing firm that was then evaluating strategic alternatives.  Though this would have been an obvious fit with ProxyMed which General Atlantic knew was pursuing an acquisition strategy, General Atlantic didn't inform ProxyMed as its only interest was whether it would be a fit for Emdeon.

97.    On Sunday, September 24, 2006, General Atlantic's Investment Committee met to review and approve the final Emdeon deal terms and economics of the transaction.  The materials presented to the Investment Committee on that date, as well as the prior iterations, indicate that General Atlantic expected its investment in Emdeon's Business Services segment, within five years, to yield a potential profit of over $400 million – which alone equaled eight times its entire investment in ProxyMed.

98.     When Monday, September 25, 2006 came, Rob Long of Allied Capital, who had met with Ford on Thursday, September 21, did an "about face" and told Lettko that Allied Capital would not provide any financing to ProxyMed. Notably, Allied Capital had a close relationship with General Atlantic, having raised debt for many of its acquisitions.

99.     Further, unbeknownst to ProxyMed, rumors had been circulating in early September 2006 among the debt financing community that General Atlantic was pursuing a transaction with Emdeon. For example, on September 11, 2006, Peter van der Goes of Goldman Sachs e-mailed Korngold asking if Goldman Sachs could help it review Emdeon's Business Services segment. Korngold's response was "No comment :-)" and "Funny what the rumor mill generates." Similarly, Korngold wrote to Neal Masian of Highland Partners on September 26, 2006 about the public announcement of the Emdeon investment stating "here's the deal we're working on, as if you didn't guess it before!" Thus, members of Allied's Investment Committee may have also heard these rumors and/or been apprised by Ford the prior Thursday that General Atlantic would not be participating in any ProxyMed financing.

100.    When Lettko received the news the evening of September 25, 2006, regarding Allied Capital, he immediately e-mailed Bill Ford about arranging for Laurus to invest $5 million, with General Atlantic and others picking up the balance ProxyMed needed to acquire PPONext. Ford, unsurprisingly, did not respond.

101.    On September 26, 2006, Emdeon announced General Atlantic's $1.2 billion investment by which General Atlantic acquired a 52 percent interest in Emdeon's Business Services segment, which was spun off as a separate company. This investment consisted of $320 million in cash and $925 million in debt. General Atlantic touted the deal as its largest investment ever in its twenty-six year history.

- 36 -

102.     This announcement caught ProxyMed completely by surprise.  Indeed, Lettko learned of it after landing in New York on September 26 for a planned meeting with existing investors in the Company and security analysts, a meeting about which Ford had known.  Lettko then tried to contact Bill Ford, including calling his home, to no avail.  Ultimately, he reached Steve Denning that night at home.  Denning, however, provided no satisfactory answers.

103.     After initially avoiding Lettko, Ford finally called him back late that night and, with the Emdeon deal concluded, proceeded to tell Lettko that General Atlantic now was unwilling to invest any additional money into ProxyMed.  Ford and General Atlantic had known this since early August, when General Atlantic had determined to pursue its largest investment ever in ProxyMed's most significant and fiercest competitor.

104.     Consistent with General Atlantic's prior disingenuous actions, Ford indicated that he would see if Emdeon would consider paying ProxyMed $5 million for a future option to use ProxyMed's Phoenix platform for processing electronic claims.  Ford did nothing to pursue this option.

105.     Lettko tried to reach Denning again on September 27.  Denning e-mailed Ford to inquire whether he had spoken with Lettko.  Ford's response to Denning was: "Yes.  For a long time.  You should not take this call."

106.     Had ProxyMed not been misled by General Atlantic and Kelly, by no later than early August 2006, it would have pursued an entirely different path for securing the financing necessary to acquire PPONext and Medical Resource LLC.  Most certainly, it would have quickly moved to obtain financing months earlier which would have been secured well in advance of the announcement of General Atlantic's massive investment in Emdeon.  It certainly would not have provided General Atlantic with its strategic goals and plans (and it would not

have held financing meetings at General Atlantic with General Atlantic personnel, which created an expectation on the part of the other potential financiers that General Atlantic would be a participant.).  It would have made clear to any potential investors that General Atlantic was only an investor at this time and thereby could have raised monies independently.  And it would have asked for Kelly to resign from the Board due to his conflict of interest.

107.    Facing a financial cataclysm, Lettko still made efforts to obtain $5 million from General Atlantic to no avail.  This was because General Atlantic's Portfolio Review Committee, was, as soon as the ink was dry on the Emdeon deal, focused on selling General Atlantic's stake in ProxyMed, and initiated various efforts to sell it. General Atlantic had no intention to provide any financing to ProxyMed.

108.    In addition, given that it was now public knowledge that Emdeon had secured a $1.2 billion investment, the Company was unable to obtain alternative financing.

109.    Although PPONext agreed to provide ProxyMed with some additional time to secure the necessary financing, ProxyMed was told repeatedly by potential financiers that it could not access the capital markets because of General Atlantic's $1.2 billion investment in Emdeon, and because General Atlantic remained silent as to its intentions with its investment in ProxyMed.  In short, General Atlantic, was then (as had been the case since early August) solely seeking to advance its largest investment in its history to secure the largest pay-off in its history, and thereby effectively ensuring the disintegration of ProxyMed.

110.    Without the ability to obtain the necessary financing, ProxyMed was unable to close on the acquisition of PPONext.  PPONext was subsequently sold in June 2007 for a higher price ($19 million) to Concentra Operating Corporation.  Commenting on the acquisition in Concentra's June 1, 2007 press release, Tom Bartlett, Concentra Network Services' President,

said, "The ppoNEXT transaction further demonstrates our commitment to investment in our network services business. ppoNEXT is an established national PPO with excellent geographic coverage. The ppoNEXT team has done a terrific job of building its network and solidifying strong provider relationships which is consistent with our objectives."

111.    ProxyMed was able to close on the purchase of Medical Resource, LLC on October 10, 2006, but had to draw on its line of credit to do so, significantly impairing the Company's ability to survive.  Without PPONext, however, which would have added significantly more providers and hospitals than Medical Resource, LLC, ProxyMed could not obtain the critical mass necessary to effectively compete.

112.    Even though months earlier, General Atlantic had recognized ProxyMed to have considerable opportunities for success, as a result of ProxyMed's inability to secure financing (the direct result of Defendants' deception), the Company's auditors issued a "going concern" opinion with respect to the Company's year-end 2006 financial statements, and the Company warned in its 10-K filed with the S.E.C. on March 15, 2007 that "If we cannot raise additional capital or generate sufficient revenues, or sufficiently reduce costs, to operate profitably, we may have to suspend or cease operations or significantly dilute our stockholders' equity holdings."

113.    Without the acquisition of PPONext, which, together with Medical Resources, LLC, would have materially transformed the mix of ProxyMed's PPO business from indirect to direct, increased its scale and created at least $6 million in synergies, ProxyMed's PPO business even with the completion of the Medical Resources, LLC acquisition, was severely hampered and it was forced in 2007 to sell that business.

114.    In November 2007, ProxyMed agreed to sell its PPO business to Coalition America, Inc. for $23.5 million in cash.  As a result of that fire sale, the Company was left only

with its EDI businesses (electronic data interchange and laboratory communications business lines), which directly competed with Emdeon Business Systems.

115.    On May 22, 2008, ProxyMed, entered into an agreement, pursuant to which the Company agreed to sell its laboratory communications services business to a subsidiary of ETSec., Inc. for $2.1 million in cash.

116.    Facing an impending default on July 31, 2008 on its line of credit from Laurus, on July 23, 2008, the Company filed a voluntary petition to effect an orderly sale of its assets under Chapter 11 of the U.S. Bankruptcy Code and announced that it would seek court approval to sell its assets to private equity firm Marlin Equity Partners LLC, subject to higher and better bids.

117.    In the course of the bankruptcy, Emdeon and General Atlantic tried to purchase ProxyMed's remaining EDI business cheaply, bidding $11.8 million to top the initial offer by Marlin Equity Partners of $11 million, but Emdeon and General Atlantic were outbid after a full day of bidding on September 8, 2008 and the assets were sold to Marlin Equity Partners for $24.25 million.  ProxyMed's press release announcing the closing of the sale in September 2008, stated in part:

> Building long-term value is our core investment strategy," said George Kase, Partner, of Marlin Equity. "And this is our plan with MedAvant. The company will continue its long-term commitment to providing its clients with quality services and support," said Kase. "The relationship with Marlin Equity Partners will enable MedAvant to pursue an aggressive growth strategy."

118.    With the proper financial backing General Atlantic failed to provide, ProxyMed's EDI business has prospered under the wing of Marlin Equity Partners.  Following several acquisitions and mergers, the Company is now known as Capario, which provides industry-leading, revenue cycle management solutions connecting payers, providers and partners nationwide.  The Company's real-time solutions help providers to speed up and improve

reimbursement, payers to gain business performance improvements and partners to increase their competitive edge in the marketplace.  By automating manual processes, organizations can reduce operational costs, minimize paper-based methods, improve efficiency and streamline communications.

119.    Had ProxyMed been able to complete the PPONext acquisition, it would not have had to sell its PPO business in 2007 and would have realized for itself the benefits that have inured to Coalition America, Inc. and would not have had to file for bankruptcy.

120.    General Atlantic sold all of its ProxyMed shares for $1 per share in late December 2008 and used the tax loss to offset taxable gains on other investments in 2008.

## COUNT I

### Breach of Fiduciary Duties
(Against Braden Kelly)

121.    Plaintiff realleges paragraphs 1 through 120.

122.    Defendant Kelly owed a fiduciary duty of loyalty and an obligation of candor to the Company, which he violated as set forth herein.

123.    Kelly owed fiduciary duties of loyalty and candor to the Company as a Director and Chairman of the Board of the Company.  Kelly breached those duties by: (a) concealing from the Company the conflict of interest he had with ProxyMed since, on August 3, 2006, facilitating General Atlantic's pursuit of a majority stake in Emdeon's Business Services segment, ProxyMed's most formidable and contentious competitor; (b) repeatedly misrepresenting that General Atlantic would participate in ProxyMed's growth plans and failing to correct, retract or modify those representations and assurances even though he knew no later than August 3, 2006 of General Atlantic's pursuit of Emdeon's transaction business of which ProxyMed was a direct competitor, and knew, by September 8, 2006, that General Atlantic was

pursuing a sale of ProxyMed to Nova; (c) sharing ProxyMed's plans to acquire PPONext with

Korngold, whom Kelly knew was heading up the Emdeon transaction; and (d) failing to advise

ProxyMed that General Atlantic could not be counted on to provide any financing because of a

conflict of interest and that the Company should pursue alternative plans to raise financing as

quickly as possible.

124.    Kelly made these statements and concealed the true facts for the benefit of

General Atlantic.  Kelly stood to benefit personally as a Managing Director of General Atlantic,

from its investment in Emdeon.  In addition, Kelly had determined in early 2006 to resign as

Managing Director of General Atlantic at the end of 2006 and knew he would have to negotiate a

severance package with General Atlantic.  Accordingly, Kelly determined to cooperate in every

request General Atlantic made to facilitate its investment in Emdeon – even to support it because

Emdeon had better potential for General Atlantic than ProxyMed.  Indeed, Kelly served General

Atlantic's interest so well, that he was given generous severance benefits.  He executed his

severance agreement  on September 11, 2006; it  became effective at year's end.

125.    Kelly's severance agreement  with General Atlantic provided that he would retain

his interests in the various General Atlantic partnerships in which he was invested with only a

change in status from General Partner to Limited Partner and would be eligible to make new

investments through the end of the year.  Kelly was therefore a Limited Partner in certain of the

partnerships that invested in Emdeon and has benefitted significantly from those interests.

126.    Accordingly, Kelly breached his duty of loyalty to ProxyMed.

127.    In violation of his fiduciary duties, as alleged above, Kelly proximately caused a

decimation of the Company's then enterprise value (the term used by General Atlantic in its own

valuation of ProxyMed), which in or about September 2006, according to General Atlantic's own

analyses, was approximately $100 million, not taking into account the benefits and synergies that would have resulted from ProxyMed's acquisition of PPONext.

128.    Defendant Kelly's actions have therefore damaged the Company.

## COUNT II

### Breach of Fiduciary Duties
(Against General Atlantic)

129.    Plaintiff realleges paragraphs 1 through 120.

130.    Defendant General Atlantic owed a fiduciary duty of loyalty and an obligation of candor to the Company, which it violated as set forth herein.

131.    At all relevant times, General Atlantic, through its agent Defendant Kelly and others, and by virtue of its approximately 27 percent voting interest in the Company, occupied a position of trust and confidence with ProxyMed, which went far beyond the terms of the Agreement by which General Atlantic invested in ProxyMed.  Specifically, as a result of the General Atlantic's close supervision of and exercise of control over the management of ProxyMed, through Kelly and others, and repeated representations of intent to provide financial support, ProxyMed was induced to and did repose trust and confidence in General Atlantic's knowledge and expertise to advise it as to strategic and operational issues facing the Company and justifiably believed that General Atlantic would engage in honest dealings with ProxyMed's best interest in mind.  General Atlantic thereby had a fiduciary obligation to disclose any conflict of interest concerning the advice it was providing to the Company – especially the advice concerning its participation in the required financing to purchase PPONext and Medical Resources.  General Atlantic breached this duty by repeatedly misleading ProxyMed with regard to financing for ProxyMed's business plans, and obtaining confidential information as to

ProxyMed's business and plans for the benefit of ProxyMed's competitor, Emdeon.

132.     Accordingly, General Atlantic owed fiduciary duties, including a fiduciary duty of

loyalty and candor, to the Company, which it violated by acting in bad faith and for its own

personal benefit as set forth herein.

133.     In violation of its fiduciary duties, as alleged above, General Atlantic proximately

caused a decimation of the Company's then enterprise value (the term used by General Atlantic

in its own valuation of ProxyMed), which in or about September 2006, according to General

Atlantic's own analyses, was approximately $100 million, not taking into account the benefits

and synergies that would have resulted from ProxyMed's acquisition of PPONext.

134.     Defendant General Atlantic's actions have therefore damaged the Company.

**COUNT III**

**Aiding and Abetting**
(Against General Atlantic)

135.     Plaintiff realleges paragraphs 1 through 120 and 122 through 128.

136.     This Count is asserted in the alternative to the breach of fiduciary duty claim

asserted against General Atlantic in Count I.

137.     As alleged above, Kelly breached his fiduciary duty of loyalty and obligation of

candor to ProxyMed.

138.     General Atlantic knew of the breach by Kelly because it was aware of the

fiduciary relationship between Kelly and ProxyMed and knew that it had directed Kelly to act

adversely to the interests of ProxyMed by facilitating General Atlantic's massive investment in

ProxyMed's most significant competitor, Emdeon, which acquisition General Atlantic knew

would be harmful to ProxyMed's business.  By doing so, General Atlantic encouraged and

directed Kelly's breach of fiduciary duty and obligation of candor to ProxyMed.

139.    General Atlantic also knew that Kelly had not disclosed that he and General Atlantic had conflicts of interest with ProxyMed, and that he had not corrected his prior representations to ProxyMed about General Atlantic's willingness to provide funding for ProxyMed's acquisitions, which it also knew was contrary to his fiduciary obligations to ProxyMed. General Atlantic substantially assisted the concealment of the existence of those conflicts of interest by failing to disclose to ProxyMed that it and Kelly had conflict of interests with ProxyMed and continuing to represent to ProxyMed, as Kelly had represented to ProxyMed, that General Atlantic was likely to provide or participate in financing ProxyMed's acquisition plans.

140.    As a result of the concerted actions of Defendants, as alleged above, the Defendants caused a decimation of the Company's then enterprise value, which in September 2006, according to General Atlantic's own analyses, was approximately $100 million, not taking into account the benefits and synergies that would have resulted from ProxyMed's acquisition of PPONext.

141.    General Atlantic's actions have therefore damaged the Company.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury on all issues raised by this Third Amended Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests that the Court enter an order granting the following relief:

A.  Awarding the Liquidating Trustee monetary damages for the harm ProxyMed sustained as a result of Defendants' wrongful conduct;

B.  Awarding costs, pre- and post-judgment interest, and attorneys' and experts' fees and expenses; and

C.  Awarding such additional relief as the Court deems just and proper.

Dated:  August 29, 2013          ROSENTHAL MONHAIT & GODDESS, P.A.

By: _____
Norman M. Monhait (#1040)
919 Market Street, Suite 1401
Citizens Bank Center
Wilmington, Delaware  19801
Tel: (302) 656-4433
Facsimile: (302) 658-7567
nmonhait@rmgglaw.com

-and-

Jeffrey A. Klafter (Admitted Pro Hac Vice)
KLAFTER OLSEN & LESSER LLP
Two International Drive, Suite 350
Rye Brook, New York  10573
Tel: (914) 934-9200
Facsimile: (914) 934-9220 (fax)

Kurt B. Olsen (Admitted Pro Hac Vice)
1250 Connecticut Ave., N.W., Suite 200
Washington, D.C.  20026
Tel: (202) 261-3553
Facsimile: (202) 261-3533

-and-

Kevin T. Hoffman (Admitted Pro Hac Vice)
Law Offices of Kevin T. Hoffman
151 Railroad Avenue
Greenwich, Connecticut  06830
Tel: (203) 869-8744
Facsimile: (203) 869-8648 (fax)

*Counsel for Plaintiff NHB Assignments LLC,
the Liquidating Trustee*